STATE of Missouri,
Plaintiff–Respondent,

v.

Ricky Lee PRUITT,
Defendant–Appellant.

No. 52958.

Missouri Court of Appeals,
Eastern District,
Division Three.

June 7, 1988.

Motion for Rehearing and/or Transfer to
Supreme Court Denied June 29, 1988.

Application to Transfer Denied
Sept. 13, 1988.

Henry Robertson, Asst. Public Defender, St. Louis, for defendant-appellant.

William L. Webster, Atty. Gen., Deborah L. Ground, Asst. Atty. Gen., Jefferson City, for plaintiff-respondent.

KELLY, Judge.

Ricky Lee Pruitt appeals from the judgment of conviction imposed following a jury trial for two counts of robbery in the first degree, § 569.020 RSMo 1986; one count of assault in the first degree, § 565.050 RSMo 1986; and one count of unlawful use of a weapon (carrying a concealed weapon), § 571.030.1(1) RSMo 1986. The trial court sentenced appellant as a prior and persistent offender and as a class X offender to thirty years on each of the robbery counts, thirty years on the assault and fifteen years on the unlawful use of a weapon, all terms concurrent with each other for a total of thirty years' imprisonment to run consecutively with a sentence imposed in Ohio. We affirm in part and reverse in part.

Viewed in the light most favorable to the verdict, the record discloses the following account.

Shortly before midnight on July 31, 1986, Jerry Matthews, a resident at Magdala Foundation, a halfway house in the City of St. Louis, was walking down the street within a block of the house. A man holding a gun emerged from behind a tree and accosted him. He told Matthews to do as he said if he "wanted to live to be an old man" and demanded Matthews' wallet. Matthews delivered the wallet and also opened his briefcase. It contained only tools so Matthews was allowed to keep it. Matthews went to the halfway house, told a counselor he had been robbed, and called the police. He described his assailant as black, between five feet seven inches and five feet nine inches tall, slender and wearing bluejeans, black shirt, a hat and a ski mask revealing the robber's nose and eyes.

Shortly after, Terrence Bowman, a counselor at Magdala, also was approached as he neared Magdala Foundation by a robber from behind a tree. The robber, armed with a gun, ordered him to stop and take off his jewelry. After the robber took two gold chains, a ring and a watch from Bowman, he instructed Bowman to leave. The robber then fled through a lot toward an alley. Bowman chased after him. The robber turned, fired one shot, missed, and kept running. Bowman went back to the halfway house. His description to the police matched the earlier one given by Matthews. Both men mentioned that, although they saw only one robber, they heard another voice in the background when they were robbed.

Officer Jones, on patrol nearby, heard the radio broadcast about the robberies at Vandeventer and Lindell Boulevard within minutes of their occurrence. He saw a car on the south side of Lindell pull from the curb with its lights off and enter a service station lot across the street. Officer Jones put a spotlight on the car. The passenger in the car exited, started to approach the police car, then turned and ran. Another officer arrived and joined Officer Jones on foot in pursuit of the suspect. The officers caught the suspect who was Richard Pruitt, appellant's brother. He was wearing a blue shirt and brown pants.

Appellant was the other occupant of the car. As Officer Carr approached, he observed appellant sitting in the car and saw him throw a gun out the car window. The

gun had four rounds in it, three live and one spent. Officer Carr ordered appellant out of the car, observed that he was wearing bluejeans and a black shirt, and arrested him. Bowman's jewelry was recovered from the ashtray of the car. Matthews found his wallet near the halfway house. Nearby was a black Gucci cap similar to that worn by the robber.

The police told the victims they had apprehended the robbers. The officers took Matthews and Bowman to the service station. Both men recognized Richard Pruitt, also a recent resident at the halfway house. Matthews stated appellant looked very much like the person who had robbed him. Bowman identified appellant as the culprit, primarily by his attire. The police then took appellant and his brother to the police station where appellant was subsequently charged.

Appellant raises three points on appeal. He claims the trial court erred by (1) overruling appellant's objection to the state's peremptory challenges because the state used six of seven challenges to remove black venirepersons; (2) overruling appellant's motion for acquittal on the charge of carrying a concealed weapon because the evidence failed to establish that the gun was concealed in a manner so as not to be discernible by ordinary observation; and (3) applying § 558.019 RSMo 1986 making it mandatory that appellant serve eighty percent of his sentence before becoming eligible for parole because the class X offender law, as applied to appellant, is an ex post facto law since the law in effect at the time of his offense placed no legislative restrictions on parole eligibility.

We address appellant's first contention that the trial court erred in overruling his objection to the state's use of six of its seven peremptory challenges to strike black venirepersons from the panel. The use of peremptory challenges against members of a defendant's race when motivated solely by racial discrimination has been held unconstitutional. *See Batson v. Kentucky*, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed. 2d 69 (1986); *State v. Antwine*, 743 S.W.2d 51 (Mo. banc 1987). Appellant states that

the reasons given by the state for its strikes were not racially neutral and, thus, failed to rebut a *prima facie* case of discrimination.

A black defendant alleging that members of his race have been wrongfully excluded from the venire may make a *prima facie* case of purposeful discrimination if he is able to show that the totality of circumstances give rise to an inference of discriminatory purpose. *Batson*, 106 S.Ct. at 1721.

In proving his *prima facie* case, a defendant may rely on the fact that peremptory challenges constitute a jury selection practice that permits "those to discriminate who are of a mind to discriminate." *Id.* at 1723 (*quoting Avery v. Georgia*, 345 U.S. 559, 562, 73 S.Ct. 891, 892, 97 L.Ed. 1244 (1953)).

A defendant must show (1) that he is a member of a cognizable racial group, (2) that the prosecutor has exercised peremptory challenges to remove members of defendant's race from the venire, and (3) that "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race". *Batson*, 106 S.Ct. at 1723; *Antwine*, 743 S.W.2d at 64. If defendant establishes a *prima facie* case of purposeful discrimination, then a rebuttable presumption of discrimination arises. *Antwine*, 743 S.W.2d at 64. The state may then overcome the objection by offering adequate race-neutral reasons for its strike of black jurors. *Batson*, 106 S.Ct. at 1723[6]. The prosecutor's explanation need not rise to the level justifying exercise of a challenge for cause. *Id.* The trial court then has the duty to consider the state's explanation in determining whether a defendant has established a *prima facie* case of racially discriminatory use of peremptory challenges. *Antwine*, 743 S.W.2d at 64.

In the instant case, we note that appellant is black. The state used six of its seven peremptory challenges to remove blacks, including one black alternate, from the venire panel. The trial court stated that of the ten blacks on the venire panel

of thirty-six persons, three were left to serve on the jury. The record does not explain why there were not four, instead of three blacks left, after the state used its challenges to remove six blacks from the ten on the venire panel. Presumably, those three blacks and nine whites comprised the final jury of twelve, with one white alternate. The record does not disclose the racial composition of the jury empaneled. The alternate juror was not needed to return the verdict and was discharged.

■ The circuit attorney explained on the record her reasons for using her strikes against five black jurors and the single black alternate juror. The alternate black venireperson was stricken after the circuit attorney learned he was unemployed. The circuit attorney further expressed her concern that he looked like an elderly man although he was only fifty-six years old. After the alternate indicated he had washed buses for Greyhound for eleven years, the circuit attorney concluded that he lacked stability. We make no determination whether the reasons given for striking the alternate were racially neutral. The record establishes that the alternate juror eventually selected was discharged before the jury retired to begin its deliberations. We discern no prejudice from the strike of a black alternate where the alternate jurors selected are not required to serve in rendering a verdict.

Of the remaining five black jurors stricken by the state, appellant in oral argument conceded that the removal of a black juror who knew one of the court's personnel, a deputy sheriff, to avoid the appearance of any impropriety or bias was racially neutral. We agree and need not discuss this strike.

■ Another black juror admitted that her son was currently imprisoned on drug charges. This juror had also been the victim of a false arrest ten years earlier. The circuit attorney exercised one of her peremptory strikes to remove this juror, as well as a white juror whose son had been recently convicted of a crime. Concern over jurors who have relatives recently convicted of crimes is a bona fide and racially neutral reason for the state to strike such jurors.

■ The circuit attorney removed a prospective juror who admitted that he had gone to school with a number of Pruitts, specifically, Vanessa Pruitt. The circuit attorney explained she feared a problem could arise with his partiality because of the possibility that during the trial, the juror might realize or remember that he knew a member of appellant's family or had heard about the family. The case, as the state highlights, involved not only appellant, but also his brother and his brother's wife, all of whom were Pruitts. We conclude the circuit attorney's decision to strike a juror to remove any possibility of a juror being acquainted with appellant's family was a racially neutral explanation.

■ Finally, appellant argues the state's strikes of two black venirepersons because these jurors were untruthful were pretextual. These two jurors had failed initially to respond to the general question whether they or anyone close to them had ever been "arrested or convicted". One of them later disclosed that she had contact with the juvenile authorities with her oldest daughter but that her daughter's case "came out very nice." The other juror stated she had "grandchildren arrested about fighting" as teenagers, but that she knew very little about the case.

Appellant argues these jurors' failure to answer a general question "cannot be inflated to a charge of lying in light of their forthright responses at a later time." The general question originally asked was sufficiently definite that several other venire members responded to the question. That these two jurors were not equally frank until directly questioned individually provides a reasonable, racially neutral basis for the circuit attorney's decision to strike them because they "had not been truthful" in their answers.

The reasons given by the circuit attorney do not indicate racial discrimination. Thus, appellant failed to prove facts and other relevant circumstances necessary to establish a *prima facie* case of racial discrimina-

tion. *Batson,* 106 S.Ct. at 1723. Even assuming appellant made a *prima facie* case of discrimination, appellant failed to rebut the validity of the reasons given by the state as *Batson* requires. Although the trial court did not make specific findings of fact required by *Antwine,* the record reflects that the state explicitly set forth its reasons for its peremptory challenges against the black jurors and that appellant offered nothing to rebut the legitimacy of the state's reasons for its exercise of its strikes. After our review of the entire record of voir dire, we are satisfied the action of the trial court in permitting the jury panel as selected to be seated was not clearly erroneous. We find no merit to appellant's first point.

Appellant's second point challenges the sufficiency of the evidence to support the charge of unlawful use of a weapon (carrying a concealed weapon) under § 571.030.1(1) RSMo 1986. He maintains the evidence failed to establish that the gun was concealed so as not to be discerned by ordinary observation.

Section 571.030.1(1) RSMo 1986 states that "a person commits the crime of unlawful use of weapons if he knowingly: (1) Carries concealed upon or about his person a knife, a firearm, a blackjack or any other weapon readily capable of lethal use." Thus, the state makes a submissible case of carrying a concealed weapon when the state's evidence and all the reasonable inferences therefrom when viewed in the light most favorable to the state, demonstrate that the defendant knowingly carries concealed upon or about his person a knife or any other deadly weapon readily capable of lethal use. *State v. Hornbuckle,* 746 S.W.2d 580, 587[11] (Mo.App.1988).

The evidence and all reasonable inferences therefrom fail to establish that appellant here carried a gun with intent to conceal. The test of concealment is that the gun must not be discernible by ordinary observation. *State v. Straub,* 715 S.W.2d 21, 22 (Mo.App.1986). A weapon is not concealed simply because it cannot be seen from a single vantage point if it is clearly visible from other positions. *Id.* If

it can only be seen from one particular vantage point, however, it is considered concealed. *Id.*

In this case, Officer Jones testified that when he saw the car occupied by appellant and his brother pull from the curb with its lights off and cross over to a gasoline station, he followed in his patrol car, put bright lights on the car, and observed Richard Pruitt exit the car, turn and run. He did not testify that he saw any gun.

Officer Carr and Officer Roy also responded to the broadcast about the robberies. While Officer Roy assisted Officer Jones in chasing Richard Pruitt, Officer Carr observed appellant sitting in the car. As Officer Carr approached the car and arrived within five feet of the driver's door, appellant threw the gun out the car window. Officer Carr did not see the gun until appellant threw it out the window.

Appellant argues the officer never got close enough to have a vantage point from which he could see where the weapon had been in the car. We agree. Officer Carr did not testify concerning his ability to see inside the car. The record fails to establish whether the gun was hidden or not. The gun could have been on the dashboard or uncovered on the seat of the car, and readily discernible by ordinary observation had the police officer been closer than five feet to the vehicle. We reverse appellant's conviction on the charge of unlawful use of a weapon.

Appellant's third and final point charges the trial court erred in applying § 558.019 RSMo 1986 making it mandatory that appellant serve eighty percent of his sentence before becoming eligible for parole. He argues that the class X offender law as applied to him is an ex post facto law because the law in effect at the time of the offense placed no legislative restrictions on parole eligibility.

In its formal entry of its judgment, the trial court found appellant to be a prior and persistent offender. The formal judgment did not indicate a finding that appellant was a class X offender. At the hearing

during trial to establish appellant's prior and persistent offender status, the court did acknowledge, however, that appellant would serve eighty percent of any sentence imposed under the new minimum term section.

Appellant was charged with offenses committed on September 4, 1986. The class X offender law, § 558.019 RSMo 1986, went into effect on January 1, 1987. Appellant was sentenced on March 20, 1987. We held in *State v. Hillis*, 748 S.W. 2d 694, 697 (Mo.App.E.D.1988), that § 558.019 RSMo 1986 is an ex post facto law in violation of the United States Constitution, Article I, Section 10, and the Missouri Constitution, Article I, Section 13, when applied to one in appellant's position. *Accord State v. Pollard*, 746 S.W.2d 632 (Mo.App.E.D.1988); *State v. McCoy*, 748 S.W.2d 809 (Mo.App.E.D.1988).

The Western District has determined that, if a sentence may be enhanced for repeated criminal acts because of changes in the law after the offenses were committed, it is of no consequence in terms of constitutional rights when the change in the law occurs. *State v. Lawhorn*, No. 39524, slip op. at 11–12 (Mo.App.W.D. March 29, 1988). The Western District relied on *State v. Acton*, 665 S.W.2d 618 (Mo. banc 1984) as controlling authority in reaching its decision. *See Lawhorn*, No. 39524, slip op. at 12.

In *Acton*, the defendant was convicted for the third time of driving while intoxicated, a felony offense under § 577.023 RSMo 1986 subjecting him to a sentence of imprisonment as a persistent offender. When *Acton* was previously convicted the first and second times for drunk driving, § 577.023 did not provide for the more severe penalties in effect after his third conviction. Our Missouri Supreme Court held that the statute was not an ex post facto law because at all three times of Acton's offenses, subsequent offenses carried some form of sentence enhancement. *Acton*, 665 S.W.2d at 620.

We believe *Acton* to be distinguishable from the situation here. In *Acton*, the statute providing for enhanced punishment was in effect at the time the third driving while intoxicated offense occurred. Here, the statute became effective between the date of appellant's crime and the date of appellant's trial. We conclude the reasoning in *Hillis* to be sound and follow its direction.

We reverse appellant's conviction for unlawful use of a weapon and that portion of appellant's sentence adjudicating him to be a class X offender and in all other respects affirm appellant's conviction.

KAROHL, P.J., and SMITH, J., concur.