**STATE of Missouri, Respondent,**

v.

**Wendell MAYNARD, Appellant.**

**No. WD 53070.**

Missouri Court of Appeals,
Western District.

Oct. 21, 1997.

---

Byron Neal Fox, Kansas City, for appellant.

Jeremiah W. (Jay) Nixon, Atty. Gen., Jefferson City, Philip M. Koppe, Asst. Atty. Gen., Kansas City, for respondent.

Before ULRICH, C.J., P.J., and BRECKENRIDGE and SPINDEN, JJ.

ULRICH, Chief Judge, Presiding Judge.

Wendell Maynard appeals his convictions following jury trial for second degree murder, section 565.021, RSMo 1994, and armed criminal action, section 571.015, RSMo 1994, and sentences of life imprisonment for the second degree murder and a term of 60 years imprisonment for armed criminal action. Mr. Maynard raises four points of error on appeal. He contends that the trial court erred in (1) instructing the jury on the lesser included offense of second degree murder, Mr. Maynard having been charged with first degree murder; (2) overruling his motion for a new trial that asserted insufficient evidence was presented to convict him on either conviction; (3) allowing Detective Wayne Owings to testify as an expert witness as he was not qualified as an expert witness; and (4) overruling his *Batson* challenge to the prosecutions's removal of three venirepersons. The judgment of convictions is affirmed.

## FACTS

Wendell Maynard lived with his girlfriend, Rewa Walker, in Kansas City, Missouri. Ms. Walker spent the evening of March 10, 1993, with Lashawn Hollingshed, Mr. Maynard's cousin. According to Ms. Hollingshed, Ms. Walker called Mr. Maynard from a pay phone between 10:00 to 11:00 p.m. to tell him that she was on her way home and that she loved him. Ms. Walker's body was found over a year later. She had been murdered. Mr. Maynard was charged with first degree murder and armed criminal action.

Mr. Maynard testified at trial that he arrived home from work between 7:00 and 8:00 p.m. on March 10, 1993, and called his friend, Robert Remson III, to arrange for a social outing. Mr. Maynard further testified that at 10:31 p.m. that evening, he called Mr. Remson from outside Mr. Remson's apartment, located at 80th and Campell in Kansas City, Missouri. At 10:53 p.m., as Mr. Maynard and Mr. Remson were driving to the Inferno Lounge, Ms. Walker called Mr. Maynard on his portable telephone to tell him that she was on her way home and that she loved him. Phone records introduced at trial showed Mr. Maynard placed a call from his cellular phone at 10:31 p.m. and received a phone call at 10:53 p.m.

Mr. Maynard and Mr. Remson arrived at the Inferno Lounge at approximately 11:00 p.m. and stayed there until it closed. They

then proceeded to Harris House where they arrived at approximately 2:00 a.m. At Harris House, Mr. Maynard met Stacy Putnam. Mr. Maynard and Ms. Putnam testified that Mr. Maynard went home with Ms. Putnam that evening and slept with her in her bed.

Mr. Maynard testified that he arrived at his apartment shortly before 9:00 a.m. on March 11, 1993. Upon arriving, he found his apartment door open and his apartment in disarray with "red stuff" on the floor. Mr. Maynard contacted Truman Medical Center and Research Hospital to discover whether Ms. Walker had been admitted or treated there.

Mr. Maynard then called Ms. Hollingshed to inquire as to Ms. Walker's whereabouts. Mr. Maynard told Ms. Hollingshed that "something was wrong in the house, that there was blood on the floor, and there was broken glass". Ms. Hollingshed went to Mr. Maynard's home to investigate. When she arrived, she found a piece of Ms. Walker's bracelet on the stairs and a piece of Ms. Walker's ring and a piece of her necklace in the dining room lying in blood. There was also broken glass and what appeared to be blood in the dining room and living room areas, on both the walls and carpet. However, when Ms. Hollingshed put her finger in the blood she found it had a perfume smell and thus, informed Mr. Maynard that she thought it was fake blood. Mr. Maynard then told Ms. Hollingshed that he was afraid that something had happened to Ms. Walker or that Ms. Walker may have hurt herself because she was upset with him for not coming home the evening before. Mr. Maynard also told Ms. Hollingshed that some of his belongings and his gun were missing.

Mr. Maynard also contacted a friend, Avery Stewart, to see whether he had seen Ms. Walker. At Mr. Maynard's request, Mr. Stewart accompanied Mr. Maynard to his apartment. Mr. Stewart suggested that the "red stuff" was not blood because it had a "smell to it" and because there was so much of it. Mr. Stewart noticed a broken glass table top, a purse and keys. Mr. Stewart observed Ms. Walker's parked car where she normally parked it, outside their apartment building. Mr. Stewart stated that he had

been at his apartment from 8:00 p.m. on March 10, 1993, to 7:30 a.m. on March 11, 1993. He stated he did not hear anything unusual on the evening of March 10, 1993, including any gunshots or glass breaking.

Mr. Maynard telephoned the Kansas City Missouri Police Department on March 12, 1993, to report that Ms. Walker was missing. Mr. Maynard did not tell the police about the "red stuff" in his apartment. The police advised Mr. Maynard to telephone back in forty-eight hours.

Mr. Maynard called Joe Davis, the next-door neighbor of Linda Walker, Rewa Walker's mother, on March 14, 1993, and asked for Linda Walker's telephone number. Mr. Davis gave Mr. Maynard the number. Ten minutes later Mr. Maynard called Mr. Davis again to ask whether Mr. Davis had seen Rewa Walker. Mr. Davis responded in the negative. Thirty to forty minutes later, Mr. Maynard called Mr. Davis again and told Mr. Davis that Ms. Walker was missing. Mr. Davis told Mr. Maynard that he should contact the police.

Mr. Maynard went to Mr. Davis's home on March 15, 1993, and told him he was going to report Ms. Walker's disappearance. Several hours later, Mr. Maynard contacted Steven Kramer, a Kansas City police detective and told him that no one had seen Ms. Walker since March 10, 1993. Mr. Maynard also told Detective Kramer that his gun was missing and that he believed Ms. Walker had taken it because she was mad at him for staying out all evening on March 10, 1993. Detective Kramer then contacted Ms. Hollingshed who told Detective Kramer that she had dropped Ms. Walker off at her and Ms. Maynard's apartment at around 10:00 p.m. Neither Mr. Maynard nor Ms. Hollingshed told Detective Kramer about the "red stuff" in Mr. Maynard's apartment.

Detective Kramer contacted Mr. Maynard on March 18, 1993, to discover whether Mr. Maynard had heard from Ms. Walker. Mr. Maynard said he had not and then told Detective Kramer that there was "red perfume" on the carpet and walls of his apartment. Detective Kramer and another detective immediately went to Mr. Maynard's apartment.

Mr. Maynard showed Detective Kramer a carpet remnant that he had cut from his living room floor. Both detectives immediately recognized the "red perfume" on the carpet remnant as blood. The officers also found blood splatters on the walls of the house and a broken table with smears of blood on the frame. When questioned, Mr. Maynard told the officers that he did not inform them of the blood because he thought it was red perfume that Ms. Walker had planted because she was mad at him. He told the officers that he thought Ms. Hollingshed knew where Ms. Walker was located because she was so calm about Ms. Walker's disappearance. Mr. Maynard then told the officers that several items were missing from the home including a .380 caliber Mac 12 handgun with a 32–round clip, a black bag containing 100 rounds of .38–caliber ammunition, $50 of his money, some of his clothing and Ms. Walker's purse. He also stated that on March 11, 1993, he moved Ms. Walker's Saab from the driveway into the garage so that no one would break into it and steal it.

Detective Kramer summoned other officers to examine Mr. Maynard's apartment. Detective Darlene Phillips noticed blood throughout Mr. Maynard's residence. Detective Tim Gee found coveralls in a closet that were covered with blood. Detective Wayne Owings found a handgun case containing a Cobray .380–caliber semi-automatic handgun magazine with nine live rounds of Winchester .380–caliber ammunition and a Bryco Arms Model 48 .380–caliber semiautomatic handgun with a loaded magazine containing seven live rounds of PMC .380–caliber ammunition in the dining room.

Detective Owings also found blood droplets on the mirror hanging in the living room and similar scrapings on the fish tank in the living room. He noticed visible blood splatters on the living room walls, ceiling and door molding and noticed a large amount of blood on the carpet remnant. Detective Owings found a Regina steamer carpet cleaner on Mr. Maynard's porch with blood in its internal chamber, a checkered comforter with blood on it in the dining room and a table in the kitchen with blood on it. Detective Owings also found two pieces of gold-colored chain, a gold-colored lion pendant and a broken gold-colored ring in the bedroom with blood on them. Mr. Maynard told the officers that he had not noticed the blood splatters on the wall because his main concern was to determine what was on the carpet. Mr. Maynard admitted using the Regina carpet cleaner to clean the carpet.

The police performed Luminol tests on the stairs leading up to the front door of Mr. Maynard's apartment, the carpet in the dining room and the trunk of Ms. Walker's Saab. The tests revealed a blue glowing coloration, a positive indication of blood. At trial, Detective Owings testified that a positive result indicates the presence of blood. On cross-examination, Detective Owings stated he did not know that the presence of copper, iron, rust or turpentine could also cause a positive result. Frank Booth, a forensic chemist with the Regional Crime Lab, testified that the positive tests indicated the presence of blood. Mr. Booth testified, however, that the presence of rust, dust particles or some cleaning agents could also cause a positive response. Mr. Maynard objected to the introduction of the Luminol tests.

The police performed DNA tests on the blood stains in the carpet, the overalls and the carpet cleaner. Utilizing a genetic profile from blood samples obtained from Ms. Walker's parents, it was determined that only 64 out of 100 million couples could have produced the kind of genetic profile found in the blood stains. Additionally, the genetic profile found in the blood stains would occur only twice in a population of 100 million.

The police determined that the 24 inch blood stain on the carpet remnant was consistent with having resulted from a gunshot wound to the head. While the blood splatters found throughout the house were not consistent with gunshot wounds, they could have been caused by two persons fighting or by moving a bloody object around. The bloodstains on the stairway leading up to Mr. Maynard's apartment were likely caused by someone's dragging a bloody object up or down the stairs. The bloodstains in the trunk of Ms. Walker's Saab were likely caused by a large bloody object being placed in the trunk. The examination of the cover-

alls showed that they contained blood stains on the left hip area, across the lap area, the back left shoulder and the right sleeve.

Ms. Walker's skeletal remains were found in Blue Valley Park on April 17, 1994, over one year after her disappearance. Ms. Walker's skull was covered with a pair of shorts and a striped Unitog rental work shirt bearing the name "Wendell" and the numbers "8223760004." The shirt and shorts that covered Ms. Walker's skull were wrapped with duct tape. Four projectiles were within the duct tape. Information obtained from Unitog established that the shirt had been rented by Mr. Maynard. Mr. Maynard admitted the shirt was his but stated that he had two to three weeks' worth of these shirts and did not realize one was missing. An examination of the skull showed multiple fractures of the left temporal and parietal areas and a gunshot wound in the left temporal region. Michael Edward Berkland, Deputy Medical Examiner from the Jackson County Medical Examiner's office, testified that Ms. Walker died from multiple gunshot wounds to the head. Mr. Berkland testified that the ½ liter of blood found in the apartment carpet remnant was consistent with multiple gunshot wounds to the head.

Seven .380–caliber Winchester shell casings and four lead slugs were recovered from the crime scene. Tests on the .380–caliber slugs revealed that they had been fired from the same firearm but not from the .380–caliber handgun recovered from Mr. Maynard's apartment. Due to oxidation and corrosion, the police could not determine whether the slugs were fired from the same firearm. The bunter marks on two of the shell casings found at the park and five of the live rounds found in Mr. Maynard's apartment had been made by the same bunter tool. Additionally, the bunter marks on five of the casings from the park and two of the live rounds found in the appellant's apartment were made by the same bunter tool. The average life of a bunter tool is 150,000 casings, and the rounds are packaged and sold in boxes of 50.

Mr. Maynard was charged with first degree murder and armed criminal action on May 10, 1994. The case was tried by jury on February 21, 1995. A mistrial was declared after the jury deadlocked. Mr. Maynard was re-tried on March 25, 1996. At the close of all the evidence, over the objection of Mr. Maynard, the court submitted the lesser included instruction for second degree murder. At the conclusion of his second trial, the jury found Mr. Maynard guilty of second-degree murder and armed criminal action and sentenced him to a term of life imprisonment for the second degree murder conviction and a term of 60 years for armed criminal action. This appeal followed.

## I. SUBMISSION OF THE INSTRUCTION FOR THE LESSER INCLUDED OFFENSE OF SECOND DEGREE MURDER

As his first point on appeal, Mr. Maynard contends the court erred when it submitted a jury instruction for the lesser included offense of second degree murder. The prosecution made the request for the lesser included instruction, and the trial court granted the request over Mr. Maynard's objection. Mr. Maynard argues that because he presented an alibi defense and denied the commission of the murder, the element of deliberation was not at issue. Thus, he argues, there was no basis for a verdict acquitting him of first degree murder and convicting him of the lesser included offense of second degree murder as required by section 556.046.2, RSMo 1994.

■ Trial courts are obligated to instruct on lesser included offenses supported by the evidence. *State v. White,* 790 S.W.2d 467, 471 (Mo.App.1990). Section 565.025.2 provides that murder in the second degree is a lesser included offense of murder in the first degree. § 565.025.2, RSMo 1994. An instruction on a lesser homicide offense will be given where "there is a basis for a verdict acquitting the defendant of the offense charged *and* convicting him of the included offense." § 556.046.2 RSMo. When a defendant denies he committed the act charged and no evidence exists to mitigate the offense charged, no instruction on the lesser included offense is required. *White,* 790 S.W.2d at 472.

The difference between first and second degree murder is the element of deliberation. *State v. Santillan,* 948 S.W.2d 574, 576 (Mo. banc 1997). A conviction of first degree murder requires the state to prove beyond a reasonable doubt that the defendant deliberated when he caused the death of the victim. *Id.* Deliberation is a mental state and is difficult to prove through direct evidence. *Id.* "[T]he mental elements establishing murder may be proved by indirect evidence and inferences reasonably drawn from the circumstances surrounding the offense." *Id.*

In *State v. Mease,* 842 S.W.2d 98 (Mo. banc 1992), *cert. denied,* 508 U.S. 918, 113 S.Ct. 2363, 124 L.Ed.2d 269 (1993), the issue of the propriety of a second degree murder instruction was before the Missouri Supreme Court. The defendant contended the court erred in not submitting a second degree murder instruction. *Id.* at 112. The evidence showed that the defendant planned the murder of one of his victims for three months in advance of the killing, acquired a variety of weapons and ammunition, dressed in camouflage, scouted the area around the victim's cabin for a full day, constructed a blind and laid waiting for several hours for the victims to emerge from the cabin. *Id.* The defendant shot each of the three victims from afar and then shot each of them once more in the head at close range. *Id.* The court held that no second degree instruction was required because "no rational fact finder could conclude the [defendant] acted without deliberation." *Id.*

In *Santillan,* the issue of the appropriateness of a second degree murder instruction was again before the Missouri Supreme Court. *Santillan,* 948 S.W.2d at 576. The evidence showed that the defendant and the victim both wanted to date the same girl, the defendant had previously threatened the victim, the defendant was seen with a loaded gun shortly before the murder, the defendant was the last person to see the victim alive, the victim was shot twice and then partially buried, the victim's blood was in the defendant's car, glass found at the scene matched glass recovered from the defendant's car and ammunition recovered from the defendant's home was consistent with the bullets found in the victim. *Id.* at 575.

The court rejected the claim that based on *Mease* the defendant was not entitled to a second degree murder instruction. *Id.* at 576. The court stated that the defendant is entitled to the second degree murder instruction in most homicide cases. *Id.* The court reasoned that indirect evidence of deliberation often supports a finding of lack of deliberation because a jury may draw different inferences from the facts on the issue of whether the defendant deliberated. *Id.* The court stated that *Mease* represents the "occasional case, in which all the evidence supports a finding of deliberation and no reasonable juror could conclude otherwise ..." *Id.*

The court then analyzed the evidence and determined that while "there were two gunshot wounds inflicted upon [the victim], none of the other evidence approaches the level of evidence in *Mease* so as to compel a determination that no rational fact finder could conclude that the defendant acted without deliberation." *Id.* at 577. For example, the court noted that while the defendant's failure to call for medical attention and his burial of the body suggested deliberation, it could equally suggest only a cover-up after the victim's death. *Id.* at 576. The court held, therefore, "if there is any doubt upon the evidence, the trial court should resolve any doubts in favor of instructing on the lower degree of the crime, leaving it to the jury to decide which of two or more grades of an offense, if any, the defendant is guilty." *Id.* at 577.

Applying *Santillan* and *Mease,* the trial court did not err in submitting an instruction for second degree murder. Contrary to Mr. Maynard's contention, his presentation of an alibi defense does not remove the issue of deliberation. Mr. Maynard's alibi defense, instead, provided a basis for acquittal because it placed him elsewhere at the time the murder was committed. Once the jury rejected Mr. Maynard's alibi defense and determined that he was responsible for Ms. Walker's murder, however, the presence of deliberation became an issue in the case.

Analysis of the evidence shows that a factual issue as to the presence of deliberation existed. Evidence of deliberation was that

Ms. Walker was shot four times in the head. The evidence, however, was inconclusive as to the circumstances under which Ms. Walker was shot. The jury could have found deliberation lacking if it believed Ms. Walker was shot during an argument with Mr. Maynard at their apartment. The evidence supports this theory because the blood throughout the apartment suggested a fight had occurred and the blood stain on the carpet remnant was consistent with a gunshot wound to the head. The evidence, however, also supports the conclusion that the fatal wounds were inflicted at the Blue Valley Park in an execution style killing which would clearly establish deliberation. The manner of Ms. Walker's death, therefore, supported an inference of deliberation, but did not conclusively establish deliberation.

Mr. Maynard's failure to obtain medical attention and his burial of Ms. Walker's body also are inconclusive on the issue of deliberation. As the *Santillan* court noted, while Mr. Maynard's failure to call for medical attention and burial of Ms. Walker's body would allow a reasonable juror ˌᴏ infer deliberation, this would also allow a reasonable juror to infer only a cover-up after the death of Ms. Walker. Finally, in contrast to *Mease*, no evidence was presented that Mr. Maynard had planned to kill Ms. Walker before the night of March 10, 1993. Thus, although the jury could have found deliberation existed, a rational fact finder could have concluded that Mr. Maynard knowingly caused Ms. Walker's death but did not deliberate as required for a conviction of first degree murder.

Because the jury could have inferred either a lack of deliberation or the presence of deliberation from the evidence, the trial court did not err in submitting an instruction for second degree murder. Point one is denied.[1]

## II. THE TRIAL COURT'S DENIAL OF MR. MAYNARD'S MOTION FOR NEW TRIAL

As his second point on appeal, Mr. Maynard argues that the trial court erred in denying his motion for a new trial. Specifically, he argues that the evidence was insufficient to support verdicts of murder in the second degree and armed criminal action because no evidence was presented to support the conclusion that it was he who shot Ms. Walker.

■ In testing the sufficiency of evidence, all evidence and inferences reasonably drawn from the evidence are viewed in the light most favorable to the verdict, and contrary evidence and inferences are disregarded. *State v. West*, 939 S.W.2d 399, 401 (Mo. App.1996). Review of the sufficiency of evidence is limited to determining whether the evidence was sufficient for reasonable persons to have found the defendant guilty as charged beyond a reasonable doubt. *Id.* Credibility of witnesses and inconsistencies in testimony are for the jury to consider. *Id.*

Mr. Maynard argues that the evidence was insufficient to establish that he had the opportunity to kill Ms. Walker because he had an alibi for the time of the murder. Ms. Hollingshed testified that Ms. Walker telephoned Mr. Maynard after 10:00 p.m. and that Ms. Walker drove her home at approximately 11:00 p.m. Telephone records show that Mr. Maynard received a telephone call at 10:53 p.m. that evening. However, Ms. Hollingshed's testimony conflicted with an earlier statement she made to Detective Kramer just five days after the killing that Ms. Walker drove her home at 10:00 p.m.

Mr. Remson testified that Mr. Maynard was with him from 10:30 p.m. to 4:00 a.m. Mr. Maynard's telephone records show that a phone call was placed to Mr. Remson from Mr. Maynard's cellular phone at 10:31 p.m. Mr. Remson testified at Mr. Maynard's first trial, however, that Mr. Maynard did not arrive at his house until between 11:45 and 12:00 a.m. Mr. Remson also testified that Mr. Maynard was one of his good friends and that they had attended high school together.

Ms. Putnam testified that Mr. Maynard was in her presence from approximately 2:00 a.m. until 8:00 a.m. the next morning. Ms.

---

1. The state argues that even if there was no evidence of a lack of deliberation, the submission of the second degree murder instruction was not error and, hence, provides no basis for an appeal. As there was evidence of deliberation, this argument need not be addressed.

Putnam testified that she knew Mr. Maynard before that evening and that they had flirted with one another on several occasions. Mr. Maynard spent the night with Ms. Putnam that evening and Ms. Putnam testified that she was interested in pursuing a relationship with Mr. Maynard. Ms. Putnam also testified that she did not speak to Mr. Maynard for weeks after the murder; however, phone records indicate that she had contacted him on several occasions immediately after the police first contacted her.

■ Analysis of Mr. Maynard's alibi witnesses reveal several inconsistencies and potential biases that were within the jury's province to resolve. The jury was entitled to believe from the evidence Ms. Hollingshed's initial testimony that Ms. Walker was home by 10:00 p.m. The jury was also entitled to believe from the evidence Mr. Remson's initial testimony that Mr. Maynard did not arrive at his apartment until almost midnight. That scenario would have provided Mr. Maynard ample time to kill Ms. Walker. Additionally, the jury could have reasonably inferred that Ms. Hollingshed, Mr Remson and Ms. Putnam were biased toward Mr. Maynard because Ms. Hollingshed was Mr. Maynard's cousin, Mr. Remson had been a high school classmate and was a good friend, and Ms. Putnam had for some time been romantically interested in Mr. Maynard. While the telephone records showed Mr. Maynard made a phone call at 10:31 and received a phone call at 10:53, the records disclosed neither the contents of the conversation nor the parties to the conversation. The jury could also have viewed the records as untrustworthy because of their belated introduction. Inconsistencies in Mr. Maynard's alibi defense, therefore, gave the jury ample reason to doubt and reject his alibi defense and hence, determine that he had the opportunity to kill Ms. Walker.

Once the jury rejected Mr. Maynard's alibi defense, a plethora of circumstantial evidence supported his being responsible for Ms. Walker's murder. Viewing the evidence in the light most favorable to the verdict, the evidence established that Mr. Maynard brutally assaulted and shot Ms. Walker with one . of his .380 caliber weapons, perhaps the missing .380 caliber Mac 12, either during or after a bloody struggle in their apartment, dragged her body down the front stairs of their apartment, threw her body in the trunk of her Saab, wrapped her head with one of his work shirts and drove to Blue Valley Park where he dumped her body. He then drove back to his apartment where he attempted to clean the blood from the front steps and the trunk of Ms. Walker's car. Only after he realized that he could not clean the blood from his apartment did he contact his friends to see whether they could determine what the "red stuff" in his apartment was. When he finally contacted the police, he did not inform them of the "red stuff" until some time later. He then kept silent for over one year concerning Ms. Walker's whereabouts and continued to deny his involvement in her disappearance and, ultimately, her death.

While contrary inferences could have been drawn from the above evidence, those inferences are not considered in weighing the sufficiency of the evidence. The evidence, therefore, was sufficient to establish Mr. Maynard wilfully and intentionally killed Ms. Walker. Point two is denied.

## III. THE ADMISSION OF MR. OWINGS'S OPINION TESTIMONY CONCERNING THE LUMINOL TEST RESULTS

As his third point of appeal, Mr. Maynard contends that the trial court abused its discretion by qualifying Detective Owings as an expert to interpret the results of the Luminol tests. He specifically contends that Detective Owings was not qualified to testify that the positive reaction to Luminol in Ms. Walker's car trunk was blood because Detective Owings was unaware a positive reaction to Luminol could be caused by agents other than blood.

■ "The test of expert qualification is whether he has knowledge from education or experience that will aid the trier of fact." *State v. Mallett*, 732 S.W.2d 527, 537 (Mo. 1987), *cert. denied*, 484 U.S. 933, 108 S.Ct. 309, 98 L.Ed.2d 267 (1987). Whether a witness is qualified to give expert opinion rests largely in discretion of trial court and its

ruling will not be disturbed on appeal unless there is a clear showing of an abuse of discretion. *State ex. rel. Jefferson County v. Watson,* 867 S.W.2d 223, 228 (Mo.App.1993); *State v. Boyd,* 706 S.W.2d 461, 465 (Mo.App. 1986). Where the trial court, within its discretion, recognizes a witness's training or experience and qualifies the witness as an expert able to assist the trier of fact, and the witness is discredited on cross-examination, the witness is no less an expert witness during the trial, able to render expert opinion. The credibility of the witnesses is for the trier of fact to determine. Allowing a witness to testify as an expert where the witness's testimony aids the trier of fact does not result in prejudice because the opponent has the opportunity on cross-examination "to sift, modify or explain what has been said, to develop new or old facts in a view favorable to the examiner and to test the correctness of the information from the witness with an eye to discrediting the accuracy or truthfulness of the witness." *State ex. rel. Utility Consumers Council v. Public Serv. Comm'n,* 562 S.W.2d 688, 694 (Mo.App.1978), *cert. denied,* 439 U.S. 866, 99 S.Ct. 192, 58 L.Ed.2d 177 (1978).

■ Detective Owings was sufficiently qualified to testify as an expert about Luminol testing. Detective Owings had worked for the Kansas City, Missouri Police Department as a detective for over twenty-four years. At the time of Ms. Walker's death, Detective Owings worked in the crime scene division. He received training at the Regional Crime Lab from the chief chemist, John Wilson, regarding how to conduct Luminol tests at crime scenes. Detective Owings had conducted Luminol tests on multiple occasions before he performed the tests at Mr. Maynard's residence and testified in detail as to how those tests were conducted. Detective Owings's past training and experience gave him ample expertise to testify about the results of the Luminol tests in Mr. Maynard's residence and in Ms. Walker's Saab. After Detective Owings was qualified by the trial court and testified as an expert witness, Mr. Maynard had the opportunity to cross-examine Detective Owings and to test his knowledge of Luminol testing. The trial court, therefore, did not abuse its discretion

in allowing Detective Owings to testify to the results of the Luminol tests. Point three is denied.

## IV. *BATSON* CHALLENGE

Mr. Maynard contends as his fourth point on appeal that the trial court plainly erred in overruling his *Batson* challenge to the state's use of peremptory strikes to remove three African–American venirepersons from the jury. Mr. Maynard asserts that the state's reasons for striking the panel members were not sufficient given the totality of the circumstances.

■ The Equal Protection Clause prohibits the prosecutor's use of peremptory challenges to exclude jurors on the basis of race or gender. *Batson v. Kentucky,* 476 U.S. 79, 89, 106 S.Ct. 1712, 1719, 90 L.Ed.2d 69 (1986); *accord J.E.B. v. Alabama ex. rel. T.B.,* 511 U.S. 127, 128–29, 114 S.Ct. 1419, 1421–22, 128 L.Ed.2d 89 (1994). The trial court's determination regarding purposeful discrimination in the exercise of peremptory strikes is a finding of fact that should not be disturbed on appeal unless clearly erroneous. *State v. Griffin,* 756 S.W.2d 475, 482 (Mo. banc 1988), *cert. denied,* 490 U.S. 1113, 109 S.Ct. 3175, 104 L.Ed.2d 1036 (1989). To be clearly erroneous, the reviewing court must have a firm and definite impression that a mistake has been made. *Id.*

■ Under the procedural guidelines established by the Missouri Supreme Court in *State v. Parker,* 836 S.W.2d 930, 939–40 (Mo. banc 1992), *cert. denied,* 506 U.S. 1014, 113 S.Ct. 636, 121 L.Ed.2d 566 (1992), if a prosecutor's use of a peremptory strike is challenged in a timely fashion on the ground that the prosecutor has engaged in race discrimination, the prosecutor is obligated to give a valid race-neutral explanation for the state's strike regardless of whether a *prima facie* case of such discrimination exists. *State v. Jackson,* 925 S.W.2d 856, 863 (Mo. App.1996). The explanation need not be plausible or persuasive, and it is presumed to be race-neutral unless a discriminatory intent is inherent in the explanation. *Purkett v. Elem,* 514 U.S. 765, 768, 115 S.Ct. 1769, 1771, 131 L.Ed.2d 834 (1995). If the prosecutor

articulates race-neutral reasons, the burden shifts back to the defendant to show that the state's proffered reasons were merely pre-textual and, in fact, racially motivated. *Jackson*, 925 S.W.2d at 864. If the defendant makes such a showing, the trial court must decide if purposeful racial discrimination has been proven. *Id.*

### A. Venirepersons Harris and Spencer

Mr. Maynard contends that the reasons given by the prosecution for striking venire-persons Harris and Spencer, African–Americans, were not race-neutral as required by *Batson*. The prosecution's asserted justification for striking venirepersons Harris and Spencer was that both were familiar with the park where Ms. Walker's body was found and both indicated that they would rely on their personal knowledge of the park rather than the evidence presented. Mr. Maynard asserts this reason was not race-neutral due to the way the questions were presented to venirepersons Harris and Spencer in contrast to the way similar questions were presented to venireperson Whitington, a Caucasian.

Analysis of the questions presented to venirepersons Harris, Spencer and Whitington illustrate that the reasons presented by the prosecution for rejecting venirepersons Harris and Spencer were race-neutral. Venire-person Harris was asked whether "the fact that you know something about the park going to prevent you from listening to that evidence?". Harris answered, "No". Harris was then asked, "If you thought something was different, you feel like you have to say 'I have been to the park and it's not like that?'". Harris answered, "Uh-huh". Later, the court asked Harris:

Q: In response to a question during voir dire you mentioned that you were familiar with this particular park. You said that you would-might tend to tell the others what you knew about the park even if it was different than the evidence. One of the instructions will be that you're to decide this case solely from the evidence and solely from the instructions of the court.

A: Okay

Q: Would you be able to do that and abide by that instruction?

A: Yes.

Venireperson Spencer was asked, "If there's something different that comes into evidence from what is known about the park, could you be guided by the testimony or do you feel like you would have to say up in the jury room?" Spencer answered, "I think I could not be guided". The prosecution then asked, "So if it was different from what you knew, you would by what you know?". Spencer answered, "right".

Venireperson Whitington was asked, after the prosecution learned Whitington had grown up close to the park, whether "[a]nything about that going to affect your ability to be a fair juror in this case?" Whitington answered, "No". The prosecution then asked, "If you heard some of the evidence that didn't meet with your recollection of the park, would you be guided by what happens here in the courtroom and not try to second-guess what you hear?" Whitington responded, "Right, right, yes".

 The questions asked of venirepersons Harris, Spencer and Whitington all sought to elicit identical information: whether the venirepersons' familiarity with Blue Valley Park would affect their duty to rely on the evidence presented in court rather than their own personal knowledge. Venirepersons Harris and Spencer indicated that if the evidence presented ran counter to their personal knowledge that they would correct the evidence presented. In contrast, venireperson Whitington indicated that she would rely on the evidence presented and would not try to second-guess the evidence. Striking venirepersons based on their assertions that they will rely on their own personal knowledge rather than the evidence presented at trial is a race-neutral reason. Because the prosecution articulated a race-neutral reason for striking venirepersons Harris and Spencer, Mr. Maynard must establish that the prosecution's articulated reason was pretextual.

Mr. Maynard first asserts that the prosecution's reasons were pretextual because the location where Ms. Walker's body was found was not an outcome determinative issue and,

thus, it would not have mattered if venirepersons Harris and/or Spencer had corrected the evidence submitted to the jury during the jury's deliberation. The prosecutor responded that his prior experience convinced him such issues can become outcome determinative if potential jurors were allowed to use their personal knowledge to disbelieve the testimony of a police officer. The trial court found the prosecutor's reasons for striking Harris and Spencer were credible and not racially motivated and rejected Mr. Maynard's contention that the prosecutor's reasons were pretextual.

Analysis of the prosecutor's reasons for striking venirepersons Harris and Spencer support the determination that the reasons stated for striking the venirepersons were not pretextual. The prosecution gave a neutral explanation for the striking. The prosecution's explanations were relevant to the crime charged and to the evidence to be adduced by the police officers and detectives. The trial court had the opportunity to observe the prosecutor ask the questions on voir dire and to state the reasons for the strike and found nothing to suggest discrimination. A reviewing court affords great deference to such a finding since the finding turns largely on an evaluation of credibility. *State v. Wilhite*, 858 S.W.2d 293, 296 (Mo. App.1993). The prosecutor's reason for striking Harris and Spencer, therefore, is not pretextual.

Mr. Maynard also contends that the prosecution's reasons were pretextual because other Caucasian venirepersons who also indicated they would rely on their own personal knowledge of the park rather than the evidence presented where not struck on those grounds. Specifically, he cites venirepersons Barnett, Neis, and Eli. While these venirepersons all indicated that they would rely on their personal knowledge over the evidence and none of the three were struck by the prosecution on those grounds, that does not establish pretext in the striking of venirepersons Harris and Spencer. Mr. Maynard's reference to venireperson Barnett who was struck by the prosecution is not persuasive because one of the grounds initially cited by the prosecution for removing venireperson Barnett was that, like Harris and Spencer, she stated that she would rely on her personal knowledge over the evidence presented. Additionally, venireperson Barnett was removed for another reason, and hence, is not analogous to venirepersons Harris or Spencer. Mr. Maynard's analogy to venirepersons Neis and Eli is equally unpersuasive because both were too far down the jury list after strikes for cause were considered to qualify for jury consideration. Mathematically, both were eliminated as potential jurors. Thus, the prosecution never had the opportunity to peremptorily strike venirepersons Neis and Eli. Mr. Maynard, therefore, has not established that the prosecution's race-neutral reasons for striking venirepersons Spencer and Harris were pretextual and, hence, his *Batson* challenge must be denied.

### B. Venireperson Bassa

Mr. Maynard contends that the reasons given by the prosecution for striking venireperson Bassa were not race-neutral as required by *Batson*. The two reasons given by the prosecution for striking venireperson Bassa were that she had worked for the Kansas City School District where Mr. Maynard's mother worked and that she had sat on a jury where no verdict was reached. Mr. Maynard asserts these reasons are not race-neutral because Ms. Bassa stated she did not think she knew Ms. Maynard and did not recognize her and because prior participation in a non-verdict trial is not automatically a legitimate race-neutral reason.

■ The state argues that Mr. Maynard failed to preserve his *Batson* claim as to Ms. Bassa being struck due to her participation in a non-verdict trial for review on appeal. In order to preserve a *Batson* challenge for appellate review, the prosecutor's use of a peremptory strike must be challenged in a timely fashion. *Jackson*, 925 S.W.2d at 863. Mr. Maynard did not object at the trial court level to the prosecution's striking Ms. Bassa due to her participation in a non-verdict trial. Mr. Maynard, therefore, may not challenge Ms. Bassa's removal on that ground.

Mr. Maynard, however, did challenge the prosecution striking venireperson Bassa due to her employment with the Kansas City

School District and, hence, did preserve his *Batson* challenge on that ground. Venireperson Bassa was asked, "Anybody work for the Kansas City Board of Education, Kansas City School District?". Ms. Bassa responded, "I used to work for the school district, but not any more." Trial counsel then asked, "How long ago did you leave the school district?". Ms. Bassa responded, "I left the school district in '90." Trial counsel then asked, "Do you believe you may know Ms. Maynard from any place?". Bassa responded, "I may. I don't know." The prosecution struck Ms. Bassa due to the possibility she knew Ms. Maynard.

 Analysis of the prosecution's exercise of a peremptory strike as to venireperson Bassa shows that the reason given for striking Ms. Bassa was not racially motivated. Primarily, removal of a venireperson to prevent the possibility that the venireperson is acquainted with the defendant's family is a racially neutral explanation. *State v. Pruitt,* 755 S.W.2d 309, 312 (Mo.App.1988). Moreover, no evidence was introduced to establish that the prosecution's reason was pretextual. The trial court had the opportunity to observe the prosecutor's demeanor and to assess his credibility and found the prosecutor's reason legitimate. Having articulated a reason that was not racially motivated, the prosecution satisfied the mandates of the Constitution. The trial court, therefore, did not err in overruling Mr. Maynard's *Batson* challenge as to venireperson Bassa. Point four is denied.

The judgment of convictions is affirmed.

All concur.